On Rehearing.
MONROE, J.
The issues remaining to be decided in this case have been narrowed, by the rulings heretofore made, to the questions arising out of the respective claims of the plaintiff and of A. H. Leonard, defendant, to the ownership of lots 1, 2, 3, 5, 6, 7, and 8 of section 23, township 16 N., range 13 F The titles of both litigants are said to be derived from the succession of J. R. J. Daniel —that of plaintiff through sales made on January 15, 1873, of lots 1, 2, 3, 7, and 8 to J. D. Cawthorn, and of lots 5 and 6 to Percy Auld; and that of defendant through a sale made to Leonard & Ashton (the Leonard of that association being the defendant herein) on December 28, 1872.
It is shown that the law firm of Nutt & Leonard (of which defendant was a member) had charge of the settlement of the succession to which the titles are traced; that, presumably under their direction, maps were prepared and recorded, whereon, in accordance with article. 132 of the Constitution (of 1868), requiring that all lands sold in pursuance of decrees of courts should be divided into tracts of from 10 to 50 acres each, the lands belonging to the succession were represented as divided into numbered lots of approximately 40 acres each, and were sold by reference to those maps. The greater portion of the record of the succession appears to have been lost, but we find in the transcript an order, of date November 23, 1871, for the sale of “all the real estate belonging to said succession, situated in the parish of *927 ■Caddo, containing about 3,620 acres,” and the Auctioneer’s return dated March 4,1872, showing that certain lands lying to the north of Tar Kiln, and Tone’s bayous, and represented on the map recorded in Book S, p. 884, had been advertised to be sold on December 27, 1871, but that the sale had been postponed, and the return then proceeds as follows:
“I therefore advertised said property * ■_* * announcing the sale to take place * * * on * * * January 17, 1872, on the- terms before mentioned [cash, subject to appraisement], the said land having been divided into tracts of 40 acres each, and sold accordingly, as provided by law, and the maps of the same having been duly recorded in recorder’s office, Caddo parish; and, having fully complied with all requirements of law, I offered the said property for sale at said time and place, when the same was sold in lots, * * * the highest bidder in each case bidding the appraised value, to wit: [I-Iere follows a list showing the lots sold, by numbers, according to map recorded in Book S, p. 884, the price obtained, and. the names of the purchasers]— making a total of $3,391.75, for the cash sales, which amount was delivered to Nutt & Leonard, attorneys for said succession, as per their receipt ; * * * and, the remainder of the tract of land above specified having failed to bring the amount of its appraisement, the same was readvertised, * * * said advertisement announcing the sale to take place * * * on Thursday, February 29, 1872, the same to be on a credit of 12 months, * ::: * when, at said time and place and upon said terms, the property was sold in lots to the parties below mentioned [here follows a list of the lots sold, with the prices and the names of the purchasers], making a total of $2,509.25, for which amount notes have been given, * * * which said notes have been delivered to the attorneys of the succession, as per receipt on writ of sale.”
The lands thus sold lie in sections 3, 4, 5, 8, 9, 11, 12, 13, 14, 15, and 16 of township 16 N., range 13 E., and in sections 29, 32, and 33 of township 17 N., range 13 E.; and, although approximating the acreage called for by the order of November 21, 1871, did not include the lots here claimed, with other lands lying to the south of the bayous mentioned, which were represented on a map recorded in Book T, p. 606.
The next sale appears to have been made on December 26, 1872, when, according to recitals of the auctioneer’s deed, there were adjudicated to J. D. Cawthorn, for $65 cash, certain tracts described as:
“The N. W. Vi of N. W. % and N. E. Vi of N. W. Vi and N. W. Vi of S. W. Vi of section 14, township 16 N., range 13 E., * * * containing- 65 acres, as per map of J. B. J. Daniel’s land, recorded in Book T, page 606. * e * The said land is also described on said map as lots 13, 14, and 15 of said section.”
This was followed, on December 28, 1872, by the sale relied on by defendant, at which there was adjudicated (with other lands) to—
“Albert H. Leonard and James I-I. Ashton, * * * present, accepting sale, the following described property, to wit: The N. E. Vi and N. W. Vi and S. W. Vi of N. W. Vi of section 23, township 16, range 13, * * * as will more fully appear by reference to the maps of said J. B.. J. Daniel’s land, recorded in * * * Book T, p. 606. Said land was sold at public sale * * * after due advertisement and compliance with every condition of the law.”
Defendant construes the description thus given as covering the seven lots here in controversy, but we are unable to adopt that construction: First. Because it renders meaningless a portion of the language construed and is not grammatically necessary, even if permissible. Thus, if we hold that the description covers the N. E. Vi of the section and the N. W. Vi of the section, then the additional language, “and S. W. Vi of N. W. describes land included in a description already given, and we have, in the same act and to the same vendees, a sale of the whole of the N. W. % of the section, followed by a sale of the S. W. Vi of the tract thus sold. Upon the other hand, construing the whole description as applying to the N. W. Vi of the section (instead of to the entire section), and as covering the N. E. Vi of N. W. Vi, N. W. Vi of N. W. Vi, hnd S. W. Vi of the N. W. Vi, it conforms to the law, and to the map with reference to which the sale was made (save as will be shown hereafter), and all the language used finds intelligible application. Second. Because the land was sold *929 at the first offering, for cash, at its appraised value, which was §1 an acre, and, as the deed to Leonard & Ashton shows that they paid §683, it follows that they must have bought (as many as, but not more than) 683 acres, a number which is, however, exceeded if we assume that they acquired more than 120 acres under the description in question. Third. Because the lots in question were sold by numbers, as per map in Book T, to plaintiff’s authors within 18 days following the sale to Leonard & Ashton, and it is not to be supposed that Nutt & Leonard, as the attorneys of the succession, after provoking a sale of land of which Leonard became the adjudicatee, would almost immediately after-wards cause the same land to be offered to the public as the property of the succession, and would keep their mouths closed whilst an innocent purchaser was buying and paying for it, and they, as attorneys of the succession, were receiving the price. Fourth. Because, in order to adopt such construction, we should be obliged to assume that defendant, or his firm, and the auctioneer, acting for the succession and under a decree of the court, proceeded in disregard of the mandate of the Constitution, with which they had previously been careful to comply, and sold the land in tracts of 155 and 158 acres, respectively, instead of in tracts of 40 acres each, as per the map to which the deed refers. It will, however, be seen, by reference to the subjoined sketch (being a substantial reproduction of a copy filed in evidence of the map recorded in Book T, save as to the numbers and acreage of lots not here involved), that according to either construction the description in Leonard & Ashton’s title gives them lots 3, 4, and 5 in section 23, whereas lots 3 and 5 were included in the sales of January 15, 1873, to plaintiff’s authors, and lot 4 was adjudicated on the same day to Jas. H. Ashton, and the explanation of the discrepancy is found in the fact that the description in question was predicated upon a misapprehension, on the part of the person who framed it, of the relation of the map in Book T to the points of the compass, by reason of which the west side of section 23 was taken for the north side and the description framed accordingly.
It is said with some emphasis that any one should have known better than to suppose that a section of government land would be laid off with the lots bearing the small numbers anywhere else than upon the north side, and that there is an arrow upon the map which any one should have known was intended to point to the north, and, it is true that any one might, and perhaps should, possess such information; but it will probably be conceded that no one has yet been born with it, and that there were some persons who had not acquired it in 1S72, and it may be that the person who was charged with the duty of describing the property in .question was of the latter class. Moreover, there are those who commit blunders, not from lack of information, but through carelessness; and, finally, it may be said that information and prudence have never, as yet, been so combined in one character as to preclude the possibility of error, to which man is as prone as are the sparks to fly upward. The defendant is hardly in a position to deny this, since he insists that error was committed in the sale to plaintiff’s authors of the land which had already been sold to him, and that his purchase included two tracts, of 155 and 158 acres, respectively, when under the law the land should have been sold in tracts of from 10 to 50 acres each. The question, then, is whether it is more likely that the attorneys of the succession committed these grave errors, which defendant now seems willing to admit and assume, or that the auctioneer or copyist, charged with describing the proper-
*933 ty, committed the error which has been suggested in framing the description. It will be observed (by again referring to the sketch) that, if the top of the map be taken as the north (as most people are apt to take it), each of the two sides of section 23 stands in the same relation 'to, and can as well be called, the north side as the other, since the section is represented with the northwest corner pointing to the top.

*931

*933 In the sale to Cawthom of December 26, 1872 (heretofore mentioned), the property adjudicated to him was described as “N. W. Yi of N. W. Yi and N. E. y2 of N. W. Yi and N. W. Yi of S. W. Yi of section 14, township 10 N., range 13 E., containing 65 acres,” to which was added, “The said land is also described on said map as lots 13, 14, and 15 of said section.” Turning to the sketch, it will be seen that the only way by which the land can be found at all according to the first description is by taking the west side of the section as the north side, and when that course is pursued, and only then, that the two descriptions coincide.
Referring to the sale of December 28, 1872, to Leonard & Ashton, it has already been stated that they paid $683 cash as the purchase price of the lands sold to them, from which the inference was drawn that they had purchased not more than 683 acres, since the land was to be sold at not less than $1 an acre (its appraised value). There were a number of tracts included in the sale thus mentioned, and two days after it had been made, to wit, on December 30, 1872, Leonard & Ashton sold to W. B. Jones and Percy Auld a number of tracts, aggregating 683 acres, and described, according to lot numbers, as per map in Book T, and that the number of acres so sold coincides with the number of dollars which the vendors had paid only two days before, suggesting that the land sold was the same as that purchased, the more particularly as the land sold is identified as having belonged to the succession of Daniel, and it does not appear that Leonard & Ash-ton acquired it at any other time or in any other way. Further, comparing the act (of December 28, 1872) with that by which Leonard & Ashton sold to Jones & Auld, we find as follows: They acquired the S. E. Yi of S. E. Yi of section 27, but there is no such tract on the map. They sold to Auld lot 1 of section 27, which becomes the S. E. % of S. E. Yi of section 27, if the west side of the section be taken as the north. They bought the S. E. Yi and N. E. Yi of section 26; but there is no S. E. Yi of section 26 on the map. They sold to Auld lot 4, and to Jones lots 1, 2, 3, 4, 6, 7, and 8, of section 26, and those lots became the N. E. Yi and S. E. Yi oí the section, if the west side be taken as the north (save as to lot 5; but, as lot 4 is sold by one act to Auld and by another to Jones, it seems reasonably certain that lot 5 was intended to be conveyed by one deed or the other, instead of lot 4). They acquired the N. E. Yi of N. E. Yi and N. W. Yi of N. E. Yi and S. W. Yi ®f N. E. Yi of section 25. They sold to Jones lots 4, 5, and 6 of section 25, which answer the description thus given only when the west side of the section is taken as the north. They acquired the S. W. Yi of section 22, but there is no such tract on the map. They sold to Auld lots 8, 9, 13 and 14, which become the S. W. Yi of the section when the west side is taken for the north side. This accounts for all the land that was acquired by Leonard & Ashton by the act of December 28, 1872, and for all that was sold by them to Jones & Auld on December 30, 1872, and (as we have stated) the total acreage called for by the sales corresponds exactly with that called for by the act of purchase, if we are authorized to consider that the price ($683) mentioned in that act represents so many acres at the appraised and selling value. In this connection we may remark that, whilst it is shown that the land of the succession *935 was appraised at $1 an acre, and whilst the only return of the auctioneer which has been offered in evidence contains the recital, “the highest bidder in each case bidding the appraised value,” and whilst the sale of December 28, 1872, to Leonard & Ashton was for cash, there is nothing in the record to indicate that any land was sold for cash for less than the amount at which it was appraised. It is conceded that A. H. Leonard, as a matter of business convenience, put the land acquired by him in the name of his brother, E. A. Leonard, and it appears that Long & Prescott bought one-half of the interest acquired by Ashton, and that thereafter A. H. Leonard (as the attorney of E. A. Leonard, the nominal owner) brought suit against Long & Prescott for a partition, alleging:
“That he [E. A. Leonard] is the owner of an undivided half interest in certain lands in said parish, particularly described in acts of sale from the succession of J. R. J. Daniel to A. I-I. Leonard, recorded March 2, 1872; to Leonard & Ashton, recorded January 1, 1873; and to J. S. Ashton, recorded March 10, 1873 — authentic copies of which are hereto annexed for particular description and reference, with the exception of the following land, included in said sales, subseqeuntly sold by said Ashton & Leonard, viz.: [And here follows a description of the lands sold to Jones and Auld, including lots 12, 13, and 14 of section 23.]”
Neither the petition (filed in 1880), nor the deeds which are annexed to it, nor the order of sale (in which the property to be partitioned is particularly described), contain any reference to lots 12, 13, and 14 of section 23, save to say that they had been acquired under those deeds, and had been sold; but they were not so acquired unless they were included in the description (in the deed of December 28, 1872, recorded January 1, 1873) which is the subject of the present controversy, and no other property which could possibly answer to that description is included in the partition. Again, Ashton died, and an inventory was taken in his succession in October, 1873; but there was not included in it any interest in the land acquired by Leonard & Ashton on December 28, 1872, from the succession of Daniel. And again, the conveyances by which defendant placed his property in the name of his brother are in the record, and, although they include lots 4, 9, and 10 of section 23, they do not include either of the lots here in question. And it is shown that those lots were assessed to J. D>. Cawthom (plaintiff’s author) from 1880 to 1891, inclusive (save lot 6, which was omitted in 1884 and afterwards), and were not assessed to defendant until 1901; plaintiff’s offer to prove that they had in the meanwhile been assessed to him or his author having been excluded.
In the argument of the case defendant gave some reasons for thinking it likely that he personally had not obtained the orders for, or supervised, the sales at which plaintiff’s authors purchased the property in dispute; but the court did not understand him to assert as a fact that he did not do so. So far as we are informed by the record, he was the attorney of the succession and participated in, if he did not have the entire charge of, the settlement of its affairs, and whether it was he or his partner who acted upon the occasions in question is wholly immaterial. His name was used with his authority, and those who purchased property, offered at the instance of Nutt & Leonard as belonging to the succession, were justified in assuming that neither member of the firm, which, as representing the succession, received the price from the auctioneer, held any adverse title or knew of any reason why the property should not be thus sold. We are therefore of the opinion that the plea of estoppel, set up by the plaintiff, is well made, and the case here presented might, perhaps, have been disposed of in a few words upon that ground, but that there would, in any event, have remained for consideration the question whether defendant is to be regarded as a possessor in good or bad *937 faith; and it was for the solution of that question that the facts have been reviewed in detail. As we now see the matter, the defendant must necessarily have understood, at the time of or before the sale to Auld on December 30, 1872, that Leonard & Ashton had acquired from the succession of Daniel, in the sale to them of December 28, 1872, no other land in section 23 than lots 12, 13, and 14; and the various independent circumstances which have been noted point, as we think, inexorably to the conclusion that the lots mentioned were sold to Auld in that belief. Having thus sold the land which he believed that he had acquired, defendant could not thereafter believe that he still owned it; nor could he believe that by virtue of such acquisition he continued to be the owner of the land here claimed, after it had been sold at his instance, or at the instance of his firm, as the property of the succession of Daniel, to plaintiff’s authors.
Taking the record as we find it, we are therefore constrained to hold (although, if defendant’s statements, made in argument, had been made as a witness during the trial, our conclusion might be different) that defendant is a possessor in bad faith; but we do not find in the record sufficient information to enable us to adjust his and plaintiff's claims as arising from that condition, and the case must be remanded for the adjustment of those claims. Defendant’s pleas of prescription, not being sustained by the facts, are overruled.
So far as the succession of Ashton is concerned, defendant is before the court claiming to be the owner of its interest in the land in dispute, and, whether Ashton would have been estopped or not, it is evident that, if (as we hold to be the ease) Leonard & Ash-ton accepted lots 12, 13, and 14 of section 23 as the property acquired by them under the description contained in the sale of December 28, 1872, and sold those lots as the property so acquired, it (the succession) would have no more interest in the land here claimed than has the defendant, since neither a succession nor an individual can by virtue of the same description buy and sell one tract of land and hold another.
It is therefore ordered that the judgment of this court, heretofore handed down, as also the judgment appealed from, be amended, to the extent that it is now ordered and adjudged that the plaintiff, J. B. Railsback, be decreed to be the owner of lots 1, 2, 3, 5, 6, 7, and 8 of section 23, township 1,6 N., range 13 E., claimed in the petition; that the defendant Albert H. Leonard be decreed to be a possessor in bad faith of said lots; that the case be remanded to the district court for inquiry into and adjustment of the respective claims of the litigants for the rents and revenues of said lots and the improvements placed thereon; and that defendant pay the cost of the appeal. It is further adjudged and decreed that in all other respects said judgment appealed from be affirmed, and said judgment heretofore handed down reinstated as the final judgment of this court.
LAND, J., recused.